**Norman J. FREDKIN and Annie G. Fredkin, Petitioners, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

**No. 88–1039.**

United States Court of Appeals, First Circuit.

Heard Nov. 2, 1988.

Decided March 30, 1989.

Donald Jay Pols with whom Beilis & Pols, P.C., New York City, was on brief, for petitioners.

David M. Moore, Tax Div., Dept. of Justice, with whom William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen and David I. Pincus, Tax Div., Dept. of Justice, Washington, D.C., were on brief, for respondent.

Before BOWNES and BREYER, Circuit Judges, and CAFFREY,* Senior District Judge.

BREYER, Circuit Judge.

In 1977 taxpayers Norman and Annie Fredkin subleased the right to mine diamonds in Namibia from a Dutch company called Imperial Finance, N.V. ("Imperial"). Their sublease required them to pay Imperial a minimum of $50,000 each year whether or not anyone mined any diamonds. The sublease referred to this payment as a "minimum royalty." And, the sublease allowed the Fredkins to deduct this advance "minimum royalty" payment from the royalties they would otherwise owe once diamonds were found and mined.

The Fredkins want to deduct their advance minimum payments from their income taxes for 1977 and for 1978 even though they mined no diamonds at all during those two years. The relevant Treasury Regulation, Section 1.612–3(b)(3) of the Treasury Regulations on Income Tax (1954 Code) (26 C.F.R.) (the "Treasury Regulation"), normally does not allow such deductions for advance payments; rather, the Treasury Regulation normally requires a taxpayer to wait and to match the royalty against the mineral production to which the royalty relates. The Fredkins have pointed out, however, that the Treasury Regulation does permit a lessee of mineral rights to "treat . . . advanced royalties as deductions from gross income for the year in which the advanced royalties are paid" *if* the "minimum royalty provision" in their lease "requires" them to pay *"a substantially uniform amount of royalties . . . at least annually . . . over the life of the lease."* *Id.* (emphasis added). The Fredkins argued to the Commissioner, and then to the Tax Court, that their sublease with Imperial requires them to pay "a substantially uniform amount of royalties" each year for the life of the sublease, and therefore they fit within the exception defined in the Treasury Regulation. Both the Commissioner and the Tax Court, however, concluded that that Treasury Regulation did not apply to the Fredkins' case. The Fredkins now appeal the adverse Tax Court decision. We affirm.

I.

After reading the contracts, leases, and other relevant record documents, we can summarize (and somewhat simplify) the facts relevant to the legal issues on this appeal as follows:

1) In 1977 Imperial obtained an option to lease mining and mineral rights on land located in Namibia (South West Africa).

2) To raise money, Imperial created 1000 "working interests" in the land. It subleased these interests to investors, such as the Fredkins, who leased one-third of one working interest.

3) The Fredkins' sublease gave them the right to mine and remove diamonds. It required them to pay Imperial a mineral royalty of $125 per carat of diamonds produced. It required them to pay royalties on 400 carats ($50,000) each year whether or not they produced any diamonds. But, it allowed them to credit this payment against royalties they would otherwise owe if and when they eventually produced some diamonds.

4) The Fredkins' sublease required them to remain in the mining project for at least three years (*i.e.,* they had to pay a minimum royalty of $150,000.) Thereafter they could notify Imperial by June 30 of any year that they no longer wished to participate. If they did so, their sublease specified that their agreement would terminate the following calendar year. But, the sublease contained one important exception. That exception consists of the right that the Fredkins' sublease gives them to continue (even after cancellation) to receive (in the sublease's language) "caratage" until the amount received eliminates any "cumulative deficiency." As we explain below, we think this language is critical to the issue of whether the Treasury Regulation allows the Fredkins to deduct their payments.

---

* Of the District of Massachusetts, sitting by designation.

5) When the Fredkins signed the sublease with Imperial, they also signed a Diamond Mining Agreement with Universal Diamond Mining, N.V. Universal promised the Fredkins, and the many other sublessees, that it would mine their diamonds for a payment of $50 per carat produced. The Fredkins also signed a "Revocable Sales Agreement" with Transworld Investors, Ltd. Transworld promised to sell all the diamonds that Universal produced. It promised to pay the Fredkins $200 per carat.

6) The contracts, taken together, indicate the following basic economics of the Fredkins' arrangements: The Fredkins would receive $200 per carat for each carat of diamonds that Universal produced. Of the $200, the Fredkins would pay Imperial $125, pay Universal $50, and keep $25 for themselves. The Fredkins' investment consisted of their obligation to pay Imperial a "minimum royalty" on 400 carats ($50,000) annually whether or not anyone found diamonds. But, the Fredkins would recover this money from the first 400 carats produced. The contract calls the extent by which production allocable to the Fredkins in any year is less than 400 carats, the Fredkins' "deficiency." The "deficiency" can accumulate over time, so that after several years of inadequate production, the Fredkins might have a "cumulative deficiency" that exceeded 400 carats. If, for example, the Fredkins remained parties to the sublease for five years, and if Universal produced no diamonds during those five years, the Fredkins would have paid Imperial $250,000; they would have accumulated a "deficiency" of 2000 carats; and they would retain the right to receive this "cumulative deficiency" even after the sublease "terminated."

■ The basic legal question before us is whether the Fredkins' sublease *"requires"* them to pay Imperial a $50,000 minimum annual royalty *"over the life of the [sub]lease."* Section 1.612–3(b)(3) of the Treasury Regulations on Income Tax (1954 Code) (emphasis added). The Tax Court recognized that the sublease would *ordinarily* lead a sublessee to pay a "substan-

tially uniform" amount of royalties ($50,000 per year) over its life. But, that court, drawing on its decision in *Cheng v. Commissioner*, 55 T.C.M. 861 (1986), held that the sublease did not *require* the sublessee to pay a "substantially uniform" amount of royalties over its life because a sublessee might unilaterally withdraw from the sublease after three years. We, however, do not see how the right to withdraw, in and of itself, could make a legal difference. If the sublessee withdrew from the sublease after, say, three years, the sublease still would have required the sublessee to have paid $50,000 per year for three years—and this would seem to amount to a "substantially uniform" amount of royalties over the "life" of the sublease, at least if one views the sublease as having terminated (and ended its "life") when the sublessee withdrew (*i.e.*, after three years). Of course, it may be that the Tax Court did not really mean that the right to withdraw *by itself* made the difference. It may be that the right to withdraw along with *certain other terms in the lease* could make a difference. Those other terms in the lease consist of terms that give the sublessee certain continuing rights—rights to receive back various sums of money—long after the sublessee has exercised his right to withdraw and to terminate the lease. Indeed, as we see it, the real legal question in this case is whether the sublessee's rights to payment that extend *beyond* the termination of the sublease are so substantial that one might reasonably say the sublease *continued to exist*, even after the sublease called for its termination. If so—if, for example, the "life" of the sublease could continue beyond, say, Year Three when the sublessee withdraws—then one might reasonably say that the sublease does not require payment of "substantially uniform" royalties over its entire "life," for it would require no royalty payments at all beyond the time the sublessee withdrew (*i.e.*, Year Three).

■ The Fredkins argue that 1) the only right that extends beyond a sublessee-termination date is the sublessee's right to receive back the royalties that the subles-

see has already paid; and 2) this right is not substantial enough to warrant saying that the "life" of the sublease extends beyond that date. We agree with the second point. That is to say, if the contract here permitted the Fredkins, after cancellation, to receive back *only* the money they had already advanced, one might analogize it to a lease allowing a tenant, after cancellation, to receive back his security deposit. It is unlikely one could characterize such a lease as 'continuing to exist' where the lessee, no longer possessing the right to occupy the premises, has no more than a right to some of his money back. Suppose, for example, the lease began in Year One and the Fredkins terminated it in Year Three. They would have paid $50,000 per year in Year One, Year Two, and Year Three. This is a "substantially uniform" payment over the "life of the lease." We could not honestly say that the "life of the lease" continued beyond Year Three simply because the Fredkins might get their $150,000 back in, say, Year Six or Year Seven.

We nonetheless think the Tax Court reached the right result, however, because, as we read the sublease, its language quite plainly gives the Fredkins rights to more than just their money back in, say, Years Six or Seven. It says that once the "Participant" gives appropriate notice, the "Agreement shall terminate, and Participant will have no further rights hereunder *except with respect to cumulative Deficiency.*" It defines "Deficiency" as the "extent to which the *number of carats* mined on behalf of Participant in any Lease Year is less than [in the Fredkins' case 400] ... Yearly Carats." And, it adds that, after cancellation, in "any year in which more than [400] ... carats are mined" in respect to what previously was the Fredkins' interest, *"all diamonds* in excess of [400] ... *shall be divided equally* among all Participants who have owned the share in question until all Participants have received *the back caratage* to which they were entitled." In other words, the contract speaks of *"caratage," i.e., diamonds;* it does not speak simply of paying the Fredkins back their advance royalties. And therefore, the Fredkins, upon unilater-

al termination of the agreement, retain the right to receive a *profit* beyond the mere recoupment of their minimum annual royalty payments. (The contract is clear about these matters; we can find no ambiguity.)

For example, if the Fredkins kept the lease for five years, and if, when they cancelled, no production had yet taken place, they would have had a "cumulative deficiency" of 2000 carats (400 carats for five years). They would have the continued right to receive 2000 carats of diamonds, if and when production eventually does take place. They would receive these diamonds out of production in any year that (in respect to their share of ⅓ of a working interest) exceeds 400 carats. In other words, the Fredkins might pay $50,000 in minimum royalties in each of years one through five (totaling $250,000); they might cancel; they might receive the 2000 carats to which their payments entitle them in years fifteen through twenty, or later. If so, they would have received gross revenues of $400,000 (2000 times $200 per carat) in years fifteen through twenty; they would have received net revenues (gross revenue less the $50 per carat payment to Universal) of $300,000 in years fifteen through twenty—$50,000 above the $250,000 royalty payments they had made many years before; and they would have made no royalty payment at all in the years when they would have received their diamonds.

A contract, such as the sublease at issue here, that continues to give a party important rights to future diamonds (including potential profit on those diamonds) after the obligation to pay royalties terminates is a contract that, in our view, continues in existence in an important way beyond that period. Its "life," in a sense, extends beyond its termination; and, of course, it did not require the Fredkins to pay any royalties at all during that "post-termination" time. Consequently, we conclude that the Fredkins were not required to pay a substantially uniform amount of royalties annually over the life of the sublease, and therefore the terms of the sublease do not meet the "minimum royalty" exception of the Treasury Regulation.

## II.

 The Fredkins make a second argument based on a different regulation that defines "delay rentals." The regulation says that

A delay rental is an amount paid for the privilege of deferring development of the property and which could have been avoided by abandonment of the lease, or by commencement of development operations, or by obtaining production.

Section 1.612–3(c) of the Treasury Regulations on Income Tax (1954 Code) (26 C.F.R). The Internal Revenue Code permits deduction in the year of payment of "rentals ... required to be made as a condition to the continued use or possession ... of property to which the taxpayer has not taken ... title or in which he has no equity." 26 U.S.C. § 162(a)(3) (1982). The Fredkins argue that Imperial in 1977 and 1978 did not yet have a property interest in the land that permitted mining; it had only a grant permitting it to prospect for diamonds. Under these circumstances, the Fredkins say, their payment of $50,000 per year was, in essence, a payment "for the privilege of deferring development of the mining property," which fact, they believe, means it is a "delay rental."

In our view, however, the record does not demonstrate the existence of a "delay rental." Treasury Regulation § 1.612–3(c) states that a delay rental is a rental paid for the privilege of "deferring" development of property and, if the interest is developed (if the lessee produces diamonds) he does not have to pay a delay rental. Thus, delay rentals buy *time*. *See Commissioner v. Wilson*, 76 F.2d 766, 769 (5th Cir.1935) (delay rentals "accrue by the mere lapse of time like any other rent," are not dependent upon the finding or production of resources, and are "not paid directly or indirectly for [minerals] to be produced, but [are] for additional time in which to utilize the land"). And because delay rentals buy time, they are not recoupable by the lessee out of production, as are royalty payments. *See* A. Bruen, W. Taylor & E. Jensen, *Federal Income Taxation of Oil and Gas Investments* 3.03[1] at 3–8 (2d ed.

1989). Here, the Fredkins must pay the "minimum royalty" whether or not they produce diamonds; that is to say, they must pay it even if they do not "delay" production. And they may recoup these payments out of future production. These facts, along with the contract's characterization of the payment as a "minimum royalty payment," would seem sufficient record justification for the Tax Court's conclusion.

The judgment of the Tax Court is

Affirmed.