**William P. CHENG,**
**Petitioner–Appellant,**

v.

**COMMISSIONER INTERNAL**
**REVENUE SERVICE,**
**Respondent–Appellee.**

**No. 90–70312.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 5, 1991.

Decided July 5, 1991.

Eugene D. Silverman, Yaakov G. Vanek, Michael C. Cohen, DeCastro, West, Chodorow & Burns, Los Angeles, Cal., for petitioner-appellant.

Gary R. Allen and Steven Parks, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before GOODWIN, PREGERSON and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

William P. Cheng deducted $30,000 from his income in 1977 and $60,000 in 1978 based on royalty payments he made in those years on diamond mining investments. The Commissioner of the Internal Revenue Service disallowed the deductions, proposing a deficiency in taxes paid for those years. Cheng petitioned the Tax Court for a review of the ruling.

Cheng appeals from the Tax Court's order granting summary judgment in favor of the Commissioner. He argues that the payments were deductible as minimum annual royalty payments under Treas.Reg. 1.612–3(b)(3). This case also presents the preliminary question whether the filing of a bankruptcy petition automatically stays an appeal from a final judgment of the Tax Court. We hold that our proceedings are not stayed, and we reverse and remand.

I

Imperial Finance, N.V., (Imperial) possesses a leasehold right to mine diamonds on certain properties in Namibia.[1] Imperial conveys subleases to others authorizing them to engage in diamond mining on its leaseholds for a minimum annual royalty payment of $150,000. The sublease entitles the sublessee to remove up to 1200 carats of diamonds per year on the property without paying additional royalties. The sublessee is required to pay a royalty of $125 per carat (or 65% of the sales price) on any diamonds mined in excess of 1200 carats per year. But a "deficiency" in the number of carats mined in any year (i.e., the amount less than 1200 carats) can be accumulated and used against production in later years. Thus, if the sublessee obtained only 1000 carats for two years in a row, 1600 carats could be mined in the third year without payment of additional royalties.

The subleases are for five-year terms. However, the sublessee can terminate the sublease by giving notice at least 30 days before the date the next year's royalty payment is due. If there is a cumulative production deficiency (i.e., the sublessee has obtained less than an average of 1200 carats per year during the sublease) the sublessee has the right, after "elect[ing] not to continue to make his Minimum Annual Royalty Payments," to receive any diamonds mined over 1200 carats per year, on a pro rata basis with any other sublessees of the leasehold, until the cumulative deficiency is eliminated.

Imperial also sells fractional shares of the subleases which provide for minimum annual royalty payments of less than $150,000. The only difference between a fractional sublease and a full sublease is that the sublessee in a fractional sublease who terminates his leasehold interest does not have a right to receive diamonds to offset an outstanding cumulative deficiency. Only those sublessees who have paid royalties of at least $150,000 may receive diamonds as an offset.

In 1977, William P. Cheng bought a ⅕ share of a full sublease. He signed a five-year sublease agreement which required him to pay a $30,000 minimum annual royalty payment. He obtained a $24,000 loan, secured by the sublease, from the Bank of Nova Scotia. He used these funds to pay

1. In their briefs, the parties refer to the area in which Imperial's leaseholds were located as South West Africa. At the time of these transactions, the status of the region was in dispute. Organized in 1894, as the German Colony of South West Africa, the area had been controlled by the Republic of South Africa since 1915, first under military occupation and then as a League of Nations Class C mandate territory adminis- tered by South Africa. Since 1946, the United Nations has claimed that it is an independent territory, held in trust by South Africa, which the U.N. denominated "Namibia" on June 12, 1968. South Africa originally denied the area's trust status and sought to incorporate the area. South Africa has, however, abandoned its claims to the area and, on March 21, 1990, Namibia achieved independence.

eighty percent of his royalty payment. The loan agreement provided that the Bank would loan him eighty percent of his annual royalty payments ($24,000) for each year of the sublease. It also provided that the principal of the loan was payable solely out of Cheng's proportional share of income earned from the working interest.

Cheng signed separate agreements with two companies to extract the diamonds and to sell them.

In 1978, Cheng purchased another ⅕ share in a full sublease. The terms of the agreement were the same as in the 1977 sublease from Imperial, except that the term was fixed at four years. No diamonds were mined under either sublease in 1977 or 1978.

In 1980, after paying $120,000 on one sublease (four annual payments of $30,000) and $90,000 on the other (three annual payments of $30,000), Cheng notified Imperial that he was terminating the subleases, and would not pay the 1981 royalty payments.

On his income tax reports for 1977 and 1978, Cheng deducted the $30,000 paid to Imperial as a royalty for 1977 and the $60,000 paid in 1978 from his gross personal income. The Commissioner disallowed the deductions and filed a notice of proposed deficiency in Cheng's income taxes for those years. Cheng petitioned the Tax Court for review, seeking a ruling that the payments were valid deductions. The Commissioner argued before the Tax Court that the Cheng's payments were not deductible because they were not "minimum annual royalty payments" within the meaning of Treas.Reg. § 1.612–3(b)(3). Alternatively, the Commissioner asserted that, if the payments were minimum annual royalty payments, Cheng had not "paid" 80% of the payments because he had used money obtained through a non-recourse note, secured solely by the sublease and payable out of the revenue from sale of the diamonds.

The Tax Court granted summary judgment in favor of the Commissioner on the first ground. It did not reach the second issue.

Cheng filed his first appeal in this matter on September 24, 1987. We dismissed that earlier appeal on the ground that the Tax Court had not entered a final judgment on all claims. *Cheng v. Commissioner*, 878 F.2d 306 (9th Cir.1989). The tax court entered a final judgment on April 10, 1988. This appeal is timely.

## II

■ Cheng filed for bankruptcy on April 11, 1991. On May 28, 1991, after this matter was set for oral argument, Cheng filed a "Notice of Automatic Stay and Motion for Continuance of Oral Argument" with us on May 28, 1991. Before we can consider the merits in this matter, we must determine whether this court has jurisdiction to take any action until the bankruptcy proceedings have been terminated or the stay has been lifted.

Cheng asserts that further proceedings in this court are automatically stayed pursuant to 11 U.S.C. § 362(a)(8). That section provides for an automatic stay of "the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor." We construe his "notice" as a motion to stay these proceedings.

The Tax Court has no jurisdiction over this matter. Its proceedings were concluded with the filing of a final judgment against Cheng. Section 362(a)(8) by its terms precludes the commencement or continuation of a proceeding that is presently before the Tax Court. It has no application to appeals to this court following the termination of proceedings in the Tax Court. Accordingly, Cheng's motion to stay the proceedings in this court must be denied.

## III

■ Cheng seeks review of the Tax Court's determination that the payments he made in 1977 and 1978 were not minimum annual royalty payments within the meaning of Treas.Reg. § 1.612–3(b)(3). We review de novo the interpretation of a Treasury Regulation. *Ward v. Commissioner*, 784 F.2d 1424, 1426 n. 2 (9th Cir.1986).

Generally, advance royalty payments on mineral leases may only be deducted from income earned from the sale of the minerals. Treas.Reg. 1.612–3(b)(3). Section 1.612–3(b)(3) permits deduction of advance royalty payments where no income has been produced, however, if the payments are made pursuant to a "minimum royalty provision." Since no diamonds were mined during 1977 or 1978, Cheng may not deduct his royalty payments unless they qualify as minimum annual royalty payments.

To permit a deduction where no income has been received from the sale of minerals, the minimum annual royalty payment agreement must require

> that a substantially uniform amount of royalties be paid at least annually over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of royalties in a greater amount.

Treas.Reg. § 1.612–3(b)(3). The Tax Court found that Cheng could terminate his sublease at any time and would not owe any further royalty payments. It held that the payments provided for in the sublease did not come within the minimum annual royalty payment exception of section 1.612–3(b)(3). Because of the termination clause, the subleases did not require Cheng to make payments over the five-year life of the sublease.

Cheng argues that the Tax Court misinterpreted the regulation. He contends that the provision which allowed him to terminate his sublease affected only the length of the sublease, not the requirements that payment be made annually prior to the termination or expiration of the sublease.

In *Fredkin v. Commissioner*, 870 F.2d 801 (1st Cir.1989), the First Circuit considered a companion case, decided by the Tax Court on the same day, involving another sublessee in Imperial's diamond mining program. The provision of the sublease in *Fredkin* contained identical language in the termination clause. The Tax Court, relying on its reasoning in this case, ruled that the annual royalty payments did not qualify under section 1.612–3(b)(3). In rejecting the Tax Court's interpretation of

section 1.612–3(b)(3), the First Circuit stated:

> We, however, do not see how the right to withdraw, in and of itself, could make a legal difference. If the sublessee withdrew from the lease after, say, three years, the sublease still would have required the sublessee to have paid $50,000 per year for three years—and this would seem to amount to a "substantially uniform" amount of royalties over the "life" of the sublease.

870 F.2d at 803.

The First Circuit's decision in *Fredkin* is a reasonable application of the regulation to the terms of the sublease agreements conveyed by Imperial. The termination clause allows Cheng to end the sublease. It does not, however, allow him to avoid the annual royalty payments due prior to the exercise of the right to terminate the sublease. We agree with the First Circuit that a clause providing for an at-will termination of a lease, but which also provides for minimum annual royalty payments until the lease expires *ex proprio vigore* or is terminated by the lessee, falls within the exemption set forth in section 1.612–3(b)(3).

IV

The Commissioner argues that the decision of the Tax Court should be affirmed on an alternative theory. The Commissioner contends that Cheng retained the right to future production under the cumulative deficiency provision of the sublease, which continued the sublease for an indefinite period without requiring uniform royalty payments. The Commissioner asserts that under this construction of the sublease, it does not come within the minimum annual royalty payment exception in section 1.612–3(b)(3).

This argument was not made in the Tax Court. Ordinarily, federal appellate courts will only consider arguments raised below. *Michael–Regan Co. v. Lindell*, 527 F.2d 653, 659 (9th Cir.1975). It is within our discretion, however, to review new arguments. *Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877–78, 49 L.Ed.2d 826 (1976). Both sides have fully briefed

this issue. Both have asked us to decide it. Resolution of the issue does not depend upon the determination of disputed facts. Accordingly, we will consider the issue.

In *Fredkin,* the First Circuit, after ruling that the royalty clause qualified as a minimum annual royalty payment provision under section 1.612–3(b)(3) prior to the termination date, nevertheless held that the advance royalty payments were not deductible. 870 F.2d at 804–05. The taxpayers in *Fredkin* had paid more than $150,000 in royalty payments. Their yield in diamonds had not averaged 1200 carats per year when they decided to terminate their annual payments. Therefore, even after termination of their minimum annual royalty payments, the taxpayers retained a right to a pro rata share of any diamonds mined in excess of 1200 carats until they had been compensated for their share of the cumulative deficiency. *Id.* at 804. Thus, the sublease continued after the "termination" date. *Id.* The Court reasoned that because their rights under the sublease continued without payment for advance royalties, the sublease did not come within section 1.612–3(b)(3)'s requirement that the lease provide for substantially uniform payments during its life.

The Commissioner argues that Cheng also retained a right to future excess production because the combined payments on both subleases amounted to more than $150,000 in royalties. This argument fails to consider the fact that the terms of Cheng's subleases required the payment of $150,000 before any right to future excess production could be obtained. Paragraph 4(f) of each sublease requires the payment of $150,000 in royalties "hereunder" in order to obtain any right to recover cumulative deficiencies in production. Thus, the terms of the subleases do not permit aggregation for the purpose of determining whether a pro rata right to excess production is retained after termination of the sublessee's duty to pay annual royalties.

Moreover, since Cheng's ⅕ share of a full sublease purchased in 1977 required an annual royalty payment of $30,000, he could not qualify for a retained interest until he had paid the amount due for the final year of the five year sublease. This lease was terminated at the end of the fourth year. On the four-year sublease purchased in 1978, his total payments were less than the $150,000 required for participation in the pro rata plan. Thus, there was no possibility under either of Cheng's subleases that the cumulative deficiency provision could result in an extension of Cheng's rights under the sublease beyond its termination date.

Cheng did not pay $150,000 under either of his subleases. Therefore, he retained no rights under either sublease after their termination dates. Thus, the holding in *Fredkin* concerning the pro rata participation rights is inapplicable under the circumstances in this case.

V

The Commissioner urges that, even if the payments qualify for deduction from income under section 1.612–3(b)(3), the record does not show that Cheng actually made a payment of the $24,000 that was ostensibly borrowed from independent lenders. Because it found that none of the payments made to Imperial qualified under section 1.612–3(b)(3), the Tax Court did not rule on this issue. We decline to reach this fact based question until after it has been litigated in the Tax Court.

The motion to stay these proceedings is DENIED. The order granting summary judgment is REVERSED and this matter is REMANDED to the Tax Court.