JOHN PETTINATO AND JUDY PETTINATO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pettinato v. Commissioner
Docket Nos. 19769-81, 23543-81
United States Tax Court
T.C. Memo 1995-85; 1995 Tax Ct. Memo LEXIS 86; 69 T.C.M. (CCH) 1962; February 28, 1995, Filed *86 Respondent's motion to strike will be granted and decisions will be entered for respondent. John Pettinato, pro se. For petitioner: Sidney A. Soltz, Joseph H. Thibodeau, and Kandace C. Gerdes, Judy Pettinato. For respondent Sergio Garcia-Pages. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined income tax deficiencies of $ 22,829.61 for 1976, $ 16,300.42 for 1977, $ 15,511.74 for 1978, and $ 18,218.61 for 1979. The sole issue for decision is whether Judy McCalister, formerly known as Judy Pettinato, qualifies as an innocent spouse under section 6013(e). We hold that she does not. Section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. References to petitioner are to Judy McCalister. References to Pettinato are to John Pettinato. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in Miami, Florida, when they filed the petition. 1. Petitioner
Petitioner graduated from high school around 1965. She married Pettinato on November 16, 1969, when she was 22 years old. Petitioners had one *87 child during their marriage. As discussed below, petitioners divorced in 1983. 2. The Auto Parts Stores
From 1976 to 1979, Pettinato owned five automobile parts stores: South Dade Auto Parts, Inc., a corporation with four stores, and A & J Auto Parts, a sole proprietorship. Petitioner was a corporate officer of South Dade Auto Parts, Inc. Petitioners both signed the notes used to finance the purchase of some of the stores. Pettinato managed the auto parts stores. He decided what merchandise to buy, how to display it, which creditors to pay, and how to deliver merchandise. Petitioner did most of the bookkeeping, wrote most of the checks to the suppliers, and made most of the bank deposits. Pettinato reported his occupation as manager, and petitioner reported her occupation as bookkeeper on their Federal income tax returns for 1976 to 1979. From 1976 to 1979, the five stores had monthly gross sales of $ 300,000 to $ 400,000 and were very profitable. Petitioner knew how profitable the stores were because she was usually present when the certified public accountant for the businesses, Benjamin Shechter (Shechter), reviewed the financial statements of the stores with *88 Pettinato each month. Shechter was petitioners' personal and business accountant from about 1969 through the years in issue. Shechter established the bookkeeping system and did the accounting for the stores. Shechter went to the South Dade Auto Parts premises at least once a month to work with petitioner on bookkeeping for the stores. Shechter discussed personal finances such as tax advice including tax shelters with Pettinato and petitioner after he worked on their business records. 3. Petitioners' Family Finances
Petitioner kept the records for her and Pettinato's personal checking and savings accounts and wrote most of their personal checks. Petitioner gathered and organized documentation for petitioners' itemized deductions. She gave Shechter a list of itemized deductions to be claimed in petitioners' joint Federal income tax returns with supporting documents. Imperial Finance, N.V. (Imperial) was a diamond mining tax shelter. Shechter visited Imperial's diamond mines in South Africa and brought back a pouch of diamonds for the promoter's brother in New York. Max Breslow, Shechter's business partner, inspected the mines the year before Shechter visited the mines. *89 Shechter invested in Imperial. Petitioners invested in Imperial and deducted losses from it in 1977, 1978, and 1979. B & S Associates, which stands for Breslow and Shechter, was a partnership that invested in S.J. Mineral Associates, Ltd. (S.J.). S.J. was a coal mining tax shelter partnership. Petitioners invested in S.J. and deducted losses from it in 1976 and 1977. Shechter recommended to petitioner and Pettinato that they invest in Imperial and S.J. He explained the investments to petitioner and Pettinato and gave them material to read about the investments. 4. Petitioner's and Pettinato's Tax Returns
Shechter prepared petitioners' income tax returns for the years in issue. Petitioners reported the Imperial losses on a Schedule C in Pettinato's name on their returns for 1977, 1978, and 1979. They reported the coal mining shelter losses identified as B & S Associates on Schedule E of their 1976 and 1977 returns in both their names. Respondent determined that petitioners were not entitled to deduct expenses for S.J. and Imperial for the years in issue. Petitioner's and Pettinato's joint tax returns from 1976-1979, as originally filed, are summarized as follows: *90 S.J.
Imperial
Petitioner's
Pettinato's
Year
Losses
Losses
Wages Income 1976
$ 50,069
$ 11,900
$ 78,439
1977
3,795
30,770
20,000
92,202
1978
30,770
26,930
97,763
1979
30,770
20,020
115,943
Petitioner signed the returns for the years in issue without reviewing them. 5. Petitioner's and Pettinato's Lifestyle
Petitioners enjoyed an upper-middle-class lifestyle from 1976 to 1979. On July 11, 1978, petitioners bought a new custom-built home in Miami on about an acre of land for $ 368,988. It had four bedrooms, three baths, a game room, a two-car garage, a screened patio with a swimming pool, a safe, and an alarm system. They sold their former residence on December 28, 1978, for $ 105,000. Their adjusted cost basis in their former residence was $ 90,000 when they sold it. Petitioner hired an interior decorator and bought at least $ 75,000 of furnishings for the new house. Petitioner wrote checks for the furnishings. Petitioners gave each other substantial gifts of jewelry. In 1977 or 1978, Pettinato gave petitioner a marquise diamond ring that cost about $ 10,000. During the years in issue he also gave her a $ 7,900 diamond bracelet *91 and several other pieces of jewelry that cost between $ 2,000 and $ 3,000. Petitioners kept the jewelry in a safe in their Miami home. Petitioner drove new cars, such as a Cadillac El Dorado, Lincoln Mark VII, Mark VIII, or Town Car, which were leased by the Pettinatos' corporation during each of the years in issue. Petitioners took about three vacations per year during the years in issue, including ski trips to Colorado and two European vacations. They traveled to Las Vegas, Nevada, on business. Petitioners reported adjusted gross income of $ 27,038.71 in 1976, $ 43,210.78 in 1977, $ 67,349.77 in 1978, and $ 108,702.00 in 1979. 6. Events Which Occurred After the Years in Issue
In 1981, petitioners decided to move from Miami to Denver, Colorado. The auto parts stores were sold on June 6, 1981. Pettinato stayed in Miami to work for the new owner as required under the agreement to sell the stores. Petitioner and her son moved to Colorado in July 1981, soon after the sale. Petitioners paid $ 50,000 as a downpayment to build a $ 225,000 house in Evergreen, Colorado, without selling their Miami home. They built the house on about 2 acres of land. It had three bedrooms, *92 two baths, and a two-car garage. Petitioner rented a house and oversaw construction of the home. She was not employed at the time. She kept the family jewelry in a safety deposit box in a bank in Evergreen. During that time, petitioner met Joe McCalister (McCalister), a carpenter. In November 1981, shortly before Pettinato was to move to Colorado, petitioner told him that she was filing for a divorce. Pettinato took one bracelet that he had recently bought for petitioner and a ring petitioner had given to him earlier. Petitioner did not take all of her jewelry when she separated from Pettinato. She sold the jewelry that she took with her. Petitioners were divorced in 1983 by a decree from the District Court for Jefferson County, Colorado. The judge presiding over the divorce ruled that the stores and notes from the sale of the stores were marital property in which petitioner owned a 50-percent beneficial interest. Under the divorce decree, petitioners' marital assets and liabilities were divided roughly in half. Petitioners were both equally liable to Dixie National Bank for $ 300,000 and Washington Federal Savings for $ 145,000 under the divorce decree. Pettinato received *93 custody of their son. Petitioner later married McCalister in Colorado. After her divorce, petitioner took evening courses in college for 3 years. Petitioner worked as a bookkeeper and typist for auto parts businesses after the divorce. Petitioner concedes that she and Pettinato benefited equally from the use of the tax savings from their tax shelter deductions. Petitioner also benefited from the sale of the auto parts stores because she and Pettinato used the proceeds to help pay for the Evergreen home. The lenders foreclosed on the mortgages for petitioners' homes around 1984. At the time of trial, petitioner earned $ 1,690 per month as a "national sales analyst", which is not explained further in the record. She owned a 1992 Honda Accord and rented her home. OPINION 1. Background: Innocent Spouse Provisions
Spouses who file joint tax returns are jointly and severally liable for tax. Sec. 6013(d)(3). Petitioner argues that she is not liable for the deficiencies because she is an innocent spouse under section 6013(e). To prevail, petitioner must prove that: (a) She filed a joint return for the years in issue; (b) there is a substantial understatement of income *94 tax attributable to grossly erroneous items of the other spouse; (c) she did not know or have reason to know of the substantial understatements when signing the returns; and (d) it is inequitable to hold her liable for the deficiencies attributable to the understatement. Sec. 6013(e)(1). If the substantial understatement of tax is due to a claim of deduction, credit, or basis, she must also show that the understatement exceeds a specified percentage of her adjusted gross income for the most recent year ending before the date the deficiency notice was mailed. Sec. 6013(e)(4); Purcell v. Commissioner, 86 T.C. 228, 235 (1986), affd. 826 F.2d 470 (6th Cir. 1987). A taxpayer must meet all of the requirements of section 6013(e) to qualify as an innocent spouse. Purcell v. Commissioner, 826 F.2d at 473. However, in view of the congressional purpose of guarding against injustice to innocent taxpayers, we should not read the innocent spouse exception too narrowly. Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975). As originally enacted in 1971, the innocent *95 spouse provision applied only if omitted income caused the substantial understatement of income tax. Act of Jan. 12, 1971, Pub. L. 91-679, 84 Stat. 2063 (codified as amended at 26 U.S.C. sec. 6013(e) (1976)). In response to the concern that the innocent spouse provision was not broad enough to protect all spouses who deserved relief, Congress, in 1984, extended innocent spouse relief to cases in which substantial understatements of tax are caused by a grossly erroneous deduction, credit, or basis reported on a return. Sec. 6013(e)(2)(B); Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 494, 801-802; [1]Erdahl v. Commissioner, 930 F.2d 585, 589 (8th Cir. 1991), revg. and remanding T.C. Memo. 1990-101. *96 Respondent concedes: (a) Petitioner filed a joint return for the years in issue, sec. 6013(e)(1)(A); (b) there are substantial understatements of tax, sec. 6013(e)(1)(B); and (c) petitioner satisfies the preadjustment year requirement, sec. 6013(e)(4). The parties dispute: (a) Whether the understatements in tax were attributable to grossly erroneous items of petitioner's spouse; (b) whether petitioner knew or had reason to know of the understatements of tax; and (c) whether it is equitable to hold petitioner liable for the deficiencies. 2. Whether the Understatements in Tax Were Attributable to Grossly Erroneous Items of Petitioner's Spouse
Petitioner must prove that the understatements of tax were attributable to grossly erroneous items. Sec. 6013(e)(1)(B). A deduction is grossly erroneous if the amount claimed has no basis in fact or law. Sec. 6013(e)(2)(B); Belk v. Commissioner, 93 T.C. 434, 441 (1989). The amount of a deduction has no basis in fact or law if the expense for which the deduction is taken was not made, if the expense is not deductible under well-established legal principles, or if no substantial legal argument can be *97 made to support the deductibility of the expense. Russo v. Commissioner, 98 T.C. 28, 32-33 (1992); Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986) (citing H. Rept. 98-432 (Part 2), at 1502 (1984)). Petitioner attached two letters (Exhibits A and B) to her reply brief to support her position that the deductions were grossly erroneous. Respondent moved to strike Exhibits A and B on the grounds that they were not admitted in evidence. Exhibit A is a letter to this Court dated May 2, 1991, from David N. Brodsky, Assistant District Counsel, Boston, Massachusetts, which states that the Commissioner alleged fraud by the promoters of the Imperial tax shelter. Exhibit B is an unaddressed, undated, and unsigned form letter with a signature block for Aubrey C. Brown, senior attorney for the Commissioner. Exhibit B states that S.J. was an abusive tax shelter and that the promoters pleaded guilty to crimes related to promoting the tax shelter. Neither Exhibit A nor B was offered or admitted into evidence. The Court can base its decision only on properly admitted evidence. Sec. 7453; Rule 143; United States v. State of Washington, 459 F. Supp. 1020, 1095 (W.D. Wash. 1978). *98 We will issue an order granting respondent's motion to strike Exhibits A and B. Petitioner argues that the deductions were grossly erroneous because the tax shelters were abusive, had no foundation in fact, and were shams. We disagree. There are three factors which tend to show, although do not establish, that the tax shelters were not shams. First, Shechter personally visited the Imperial mines and brought back diamonds, as did his partner Breslow. Second, we did not find that Imperial was a sham when we reviewed it in Fredkin v. Commissioner, T.C. Memo. 1986-154, affd. 870 F.2d 801 (1st Cir. 1989) (lease did not satisfy the annual royalty provision of section 612). Third, respondent did not determine that petitioners' tax shelter deductions were grossly erroneous, factual or legal shams, or that petitioners were liable for any additions to tax. See Shenker v. Commissioner, T.C. Memo. 1985-301, affd. in part and revd. and remanded in part 804 F.2d 109 (8th Cir. 1986). Petitioner offered no evidence that the tax shelter deductions were grossly erroneous other *99 than Exhibits A and B. [2] We conclude that petitioner has not proven that there was no basis in fact or law for the Imperial and S.J. deductions. [3]Sec. 6013(e)(2)(B). 3. Whether Petitioner Knew or Had Reason To Know of the Understatement of Tax
To qualify as an innocent spouse, petitioner must prove that she did not know or have reason to know of the substantial understatement when she signed the returns for 1976 to 1979. Sec. 6013(e)(1)(C). a. Actual Knowledge of the Understatement
Petitioner contends that she had no actual knowledge *100 of the understatements because she had no knowledge of the underlying transactions, she relied on Shechter and Pettinato to file correct tax returns, and did not review the returns for the years in issue when she signed them. We need not decide whether petitioner had actual knowledge of the understatements because even if she did not know of the understatements, we believe she had reason to know of them, as discussed next. b. Reason To Know of the Understatement
To decide this issue, we consider whether, at the time of signing the returns, a reasonable person in petitioner's circumstances could be expected to know of the substantial understatement. Kistner v. Commissioner, 18 F.3d 1521, 1525 (11th Cir. 1994), revg. and remanding T.C. Memo. 1991-463; Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. on this issue T.C. Memo. 1984-310; Sanders v. United States, 509 F.2d at 166-168. *101 Petitioner contends that she lacked knowledge or had no reason to know of the understatements in her and Pettinato's tax returns because she signed them without reading them. We disagree. Taxpayers who sign their tax returns are presumed to have knowledge of their contents. Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Terzian v. Commissioner, 72 T.C. 1164, 1171 (1979). Lack of knowledge of the tax consequences of a transaction does not establish that a taxpayer lacks knowledge of an understatement which results from the transaction. Purcell v. Commissioner, 826 F.2d at 474; Bokum v. Commissioner, 94 T.C. 126, 145-146 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Courts have considered a variety of factors in deciding whether a taxpayer had reason to know of a substantial understatement. These factors may also give a taxpayer a duty to inquire as to the existence of an understatement which, if not satisfied, may lead to the conclusion that the taxpayer had reason *102 to know of the understatement. Guth v. Commissioner, 897 F.2d 441, 444-445 (9th Cir. 1990), affg. T.C. Memo. 1987-522; Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989). No single factor controls. Silverman v. Commissioner, T.C. Memo. 1994-153; see also Guth v. Commissioner, supra at 444. We consider the following factors in deciding whether petitioner had reason to know of or a duty to inquire with respect to the understatement of income tax at issue here. (i) Whether petitioner's knowledge about the underlying activity was of such a degree or quality as to put her on notice of the erroneous deduction. Hayman v. Commissioner, supra at 1262 (taxpayer knew of tax shelter, and signed related documents and checks); Stevens v. Commissioner, supra at 1501-1502 (taxpayer was an officer and bookkeeper in her husband's corporation that marketed and sold tax shelters); Bokum v. Commissioner, supra at 146-150 (taxpayer knew *103 of the underlying circumstances that led to the understatement); cf. Kistner v. Commissioner, supra (taxpayer had no involvement in husband's business and was denied access to financial records). We believe that petitioner knew of Imperial and S.J. when she signed the returns for the years in issue. Shechter had suffered a stroke and his health was poor, but we believe that his testimony was unbiased between petitioner and Pettinato. On direct examination, Shechter testified that he discussed tax shelters with both petitioners and recommended to both petitioners that they invest in the coal and diamond mining tax shelters. Shechter testified that he met with petitioners monthly to discuss business and personal finances, such as tax shelters, that petitioner was the bookkeeper for the stores and wrote most of the checks, and that he discussed petitioners' business and tax returns with petitioner. On cross-examination he said he did not recall any specific discussion he had with petitioner about any tax shelter investment. His testimony on cross-examination that he did not recall any specific discussion does not contradict his direct testimony *104 that he discussed Imperial and S.J. with petitioner and Pettinato. We conclude that Shechter discussed the coal and diamond mining tax shelters with petitioner and that petitioner knew about them when she signed the returns for the years in issue. Petitioner testified that she had no knowledge of the tax shelters until well after the years in issue. We did not find her testimony credible. She understated her duties with the auto parts stores, as shown by Shechter's testimony. Petitioner testified that she was an accounts receivable clerk who wrote three to four checks per year and was not involved with tax returns. She testified that she was not the bookkeeper. However, her joint tax returns say she was a bookkeeper. Shechter testified and we found that petitioner did most of the bookkeeping, wrote most of the checks, and made most of the bank deposits. Petitioner gave Shechter a list of items to deduct on her and Pettinato's tax returns and related documentation. Contrary to her testimony, petitioner was heavily involved in her family's business and personal finances. Petitioner also testified in this case that she had no interest in the stores. However, in her divorce, *105 she argued that she had a 50-percent interest in the stores. This factor favors respondent. (ii) Whether petitioner was involved in her family's finances, and if so, to what extent. Hayman v Commissioner, supra at 1261-1262; Erdahl v. Commissioner, 930 F.2d at 591. Petitioner was heavily involved in her and Pettinato's financial and business affairs. This factor favors respondent. (iii) Whether petitioner was intelligent, well-educated, or had financial aptitude. Hayman v. Commissioner, supra. Petitioner contends that she had limited education. Petitioner handled the family business finances and was the bookkeeper for the five auto parts stores. Shechter testified that she was a good bookkeeper. She also handled the family finances. We conclude that petitioner's intelligence, education, and experience show financial aptitude. This factor favors respondent. (iv) Whether petitioner was involved in preparing the 1982 tax return or met with their tax return preparer, Stevens v. Commissioner, 872 F.2d at 1506, and whether the return preparer's *106 conduct was suspicious, Bokum v. Commissioner, supra at 147-148 (preparer did not sign return and made an obvious error on the return). Petitioner contends that she did not know how to read a tax return. However, petitioner gathered data and documents which she gave to Shechter to use in preparing petitioners' and the stores' income tax returns. Shechter's conduct was not suspicious. This factor favors respondent. (v) Evasiveness by the taxpayer's spouse may trigger a duty to inquire. Stevens v. Commissioner, supra at 1505. Similarly, good communication between the spouses may indicate that the taxpayer had reason to know of the understatement. Hayman v. Commissioner, 992 F.2d at 1262-1263 (taxpayer's husband's lack of deceptiveness supports conclusion that taxpayer knew or should have known of the understatement). This is because a nonevasive spouse is thought to be more likely than an evasive spouse to communicate relevant knowledge to his or her spouse. In contrast, lack of communication between spouses, absent a perception that the other spouse was deceptive, may indicate *107 that the taxpayer did not have a reason to know of the understatement or a duty to inquire as to the possibility of an understatement. Guth v. Commissioner, 897 F.2d at 444. The record in this case does not show that Pettinato was evasive or uncommunicative during the years in issue. Petitioner and Pettinato's monthly meetings with Shechter show that they communicated about finances. This factor favors respondent. (vi) Whether petitioner was aware of expenses that were unusual or lavish in comparison to the family's standard of living in prior years. Kistner v. Commissioner, 18 F.3d at 1525; Guth v. Commissioner, supra; Stevens v. Commissioner, supra at 1505-1506; Sanders v. United States, 509 F.2d at 167; Mysse v. Commissioner, 57 T.C. 680, 699 (1972). Petitioner was fully aware of her and Pettinato's many expenses for vacations, home, and furnishings. Petitioner alleges that many of her trips were paid by Parts Depot or its owner, Ed Subbot. However, the record does not support this *108 allegation, which first appears in petitioner's reply brief. Petitioner admits that petitioners bought expensive jewelry during the years in issue and that it was not normal support. She argues that we should not consider the jewelry here because she claims Pettinato took the jewelry from her in 1981 after the returns were filed for the years in issue. However, the issue here is whether lavish expenditures gave her reason to know of the understatement; that is not affected by events after the returns were filed. Petitioners' new Miami home was lavish, especially considering that they paid $ 368,988 in 1978. [4] It was on an acre of land with an enclosed patio, swimming pool, game room with a built-in wet bar. In addition, petitioner paid $ 75,000 for furnishings. *109 Petitioner argues that the purchase of their homes was not a lavish or unusual expense because their homes were heavily mortgaged. The record does not show that petitioners' homes were heavily mortgaged during the years in issue. The record shows that on March 7, 1983, petitioners' Miami home was used as collateral for loans from Dixie National Bank and Washington Federal Savings. If both were purchase money mortgages, the lenders would have lent $ 445,000 for a $ 368,988 house. However, there is no evidence of which, if any, of the loans for which the homes were collateral were purchase money mortgages or were in effect during the years in issue. Thus, petitioner's argument that her homes were not lavish because of the mortgages is not convincing. We conclude that petitioner had lavish and unusual expenses during the years in issue. This factor favors respondent. (vii) Whether there were large deductions on the tax returns in issue. Large deductions, particularly those that completely or substantially eliminate taxable income, may give a taxpayer reason to know that an understatement exists or a duty to inquire as to the legitimacy of the deduction. Hayman v. Commissioner, 992 F.2d at 1262. *110 Petitioners reported adjusted gross income and deductions for the tax shelters in issue as follows: Adjusted Gross
Tax Shelter Year
Income
Deductions
1976
$ 27,038
$ 50,069
1977
46,211
34,565
1978
67,350
30,770
1979
108,702
30,770
Although these deductions are large, we do not believe that they, in isolation, should have alerted petitioner to the existence of an understatement. Petitioner argues that she had no reason to know of the understatement because she relied on Shechter to prepare the return correctly. Pettinato also relied on Shechter. We do not believe that Pettinato knew more about Imperial and S.J. than petitioner did. The Court of Appeals for the Eleventh Circuit has held that neither spouse is an innocent spouse under section 6013(e) if both spouses were aware of the underlying transaction but were unaware that the deductions they took due to the transaction were improper. Bokum v. Commissioner, 992 F.2d 1132, 1135 (11th Cir. 1993) (grossly erroneous); see also Price v. Commissioner, 887 F.2d 959, 964 (9th Cir. 1989). c. Conclusion
Petitioner did not convince us that *111 she had no reason to know of the understatements. Sec. 6013(e)(1)(C). 4. Whether It Is Inequitable To Hold Petitioner Liable
Petitioner must prove that it is inequitable to hold her liable for the understatements of income tax. Sec. 6013(e)(1)(D). In deciding this issue, we have considered whether the spouse claiming relief significantly benefited from the understatement of tax. Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989). Petitioner concedes that she benefited significantly from the substantial tax savings generated by the diamond and coal tax shelter deductions. Even without that concession, the record shows that she significantly benefited from the understatement. During the years in issue, petitioner received gifts of expensive jewelry including a diamond ring costing about $ 10,000, drove new luxury cars almost every year, lived in new homes with expensive furniture and furnishings and a swimming pool, and took about three vacation trips per year. Petitioner received roughly 50 percent of her and Pettinato's marital assets under their divorce decree. For these reasons, petitioner significantly benefited from the understatements *112 of tax. Petitioner argues that it is inequitable to hold her jointly liable for the understatements of tax because she had very little of the marital assets at the time of the trial of this case. We disagree. The approximately equal division of assets and liabilities in the divorce decree shows that both petitioner and Pettinato benefited equally from their business and financial activities. We conclude that it is equitable to hold petitioner and Pettinato jointly liable for deficiencies in the years in issue. Petitioner argues that it is inequitable to hold her jointly liable for the understatements of tax because she claims that Pettinato took her jewelry from their safety deposit box after she left him in the fall of 1981. We heard sharply conflicting testimony from petitioner and Pettinato about the disposition of their jewelry. The most credible evidence about petitioners' jewelry is the divorce decree. [5] The divorce decree is dated March 7, 1983, after the alleged misappropriation by Pettinato. There is nothing in the divorce decree that indicates that Pettinato took petitioner's jewelry. Instead, it states that all articles of jewelry in the possession of each party *113 were gifts. The divorce decree states that petitioner had substantial amounts of jewelry. In addition, petitioner sold some of her jewelry after she left Pettinato and before the divorce, and thus benefited from the sale. We disagree with petitioner's claim that she did not benefit from the jewelry because Pettinato took it from her. Petitioner's claim about the disposition of jewelry does not convince us that it is inequitable to hold her jointly liable for petitioners' tax in the years in issue. Petitioner argues that it is inequitable to hold her liable because she did not benefit from petitioners' homes, which were heavily mortgaged. Petitioner benefited from the homes because she lived in them and owned a one-half interest *114 in them. She decorated and furnished them well. Petitioners made the mortgage payments while petitioner lived in the homes. In addition, as discussed above, we do not know the amount of the mortgage used to buy the houses. The fact that the homes may have been heavily mortgaged in 1983 does not convince us that petitioner did not benefit from them during the years in issue and before 1983. Petitioner also argues that it is inequitable to hold her jointly liable for tax because lenders foreclosed on the home mortgages. As discussed above, the divorce decree divided assets and liabilities roughly equally. We infer that the foreclosures affected both parties about equally. We conclude that the fact that the mortgages on petitioners' homes were foreclosed does not make it inequitable to hold petitioner jointly liable for the deficiencies for the years in issue. Petitioner contends that she received only normal support. We disagree. Petitioner received expensive jewelry, which she conceded was not normal support, and new homes with expensive amenities. She drove new luxury cars during the years in issue. There is no evidence of petitioner's standard of living before the years *115 in issue. Thus, we cannot conclude that the expensive jewelry, luxury cars, and new homes with expensive amenities were normal support during the years in issue. For reasons discussed above, we conclude that petitioner fails to meet the requirements of section 6013(e)(1)(B), (C), and (D). To reflect the foregoing, Respondent's motion to strike will be granted and decisions will be entered for respondent. Footnotes
1. The 1984 amendments to sec. 6013(e)↩ apply retroactively to all open tax years. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424(c)(1), 98 Stat. 494, 803. Thus, the 1984 statute applies here.
2. Exhibits A and B prove less than petitioner asserts. Exhibit A states that the Commissioner believed that the Imperial promoters were liable for fraud. It does not necessarily follow that the deductions were grossly erroneous if the Imperial promoters committed fraud. Exhibit B is an unsigned form letter entitled to little, if any, weight.↩
3. We need not decide whether the tax shelter deductions are solely attributable to Pettinato under sec. 6013(e)(1)(B)↩.
4. The record does not indicate how much petitioners paid as a downpayment and how much they financed for this house. They did not have the benefit of proceeds from their previous home because they did not sell it until about 6 months after they bought the new house.↩
5. The divorce decree states in pertinent part: "The Court finds that each party has substantial jewelry which the Court finds are gifts and are therefore non-marital property and each party shall keep the jewelry currently in his or her possession as his or her sole and separate property." ↩